Filed 5/16/24  In re A.R. CA2/2

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | B331352 (Los Angeles County Super. Ct. No. 18CCJP01916B-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C.F.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, C.F. (father) appeals the juvenile court's orders terminating his parental rights to his two young sons (sons). Father makes two arguments on appeal. First, he claims the juvenile court erred when it refused to apply the beneficial parental relationship exception to termination of parental rights. Second, father argues the juvenile court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. Father seeks a reversal of the termination of his parental rights.

We find no reversible error and, therefore, affirm.

## BACKGROUND

### 1. The Family

Sons' mother, A.R. (mother), and father had a contentious relationship that included domestic violence. Father had been convicted twice for physical violence against mother. The parents consistently violated protective orders. The older son was born during a prior dependency proceeding (involving a half sibling) and the younger son was conceived while a restraining order was in effect protecting mother from father. During the underlying proceedings here, mother and father again violated court orders

2

by continuing their relationship, resulting in mother becoming pregnant and giving birth to twin boys (twins).[1]

Mother has an older daughter, who is sons' half sibling (half sister). When mother was pregnant with older son, half sister was the subject of a separate dependency case. In that case, the juvenile court sustained, among other things, allegations that mother and father engaged in physical altercations in the presence of half sister, and mother and father failed to abide by a criminal protective order. At the conclusion of that case, half sister's father received sole physical custody of half sister.

Mother's own mother (maternal grandmother) suffered from substance abuse, which resulted in mother's placement in foster care for two years when she was younger. Mother said her relationship with maternal grandmother had improved. Mother's father was killed when she was a child. Mother has five siblings, with whom she keeps in touch. For a portion of the underlying proceedings, sons were placed with one of mother's sisters (maternal aunt), with whom the Department often communicated. Additionally, mother stated one of her brothers (maternal uncle) is part of her support system.

Father lived primarily with his parents (paternal grandfather and paternal grandmother), some siblings, including his twin brother, and other relatives. Department social workers spoke with father's brother at least once and with both paternal grandfather and paternal grandmother throughout the proceedings below.

---

[1] The twins are not involved in this appeal.

3

## 2. Petition and Supplemental Petition

In November 2020, father physically abused mother, which resulted in father's arrest and ultimate conviction for spousal abuse, the issuance of a three-year criminal protective order, and the removal of sons from father.

In January 2021, the Department filed a Welfare and Institutions Code section 300 petition on behalf of sons (petition).[2] At the time the petition was filed, older son was two years old and younger son was eight months old. The juvenile court sustained allegations regarding father's domestic violence against mother, mother's failure to protect sons, mother's previous inappropriate discipline of half sister, and father's substance abuse. The court declared sons dependents of the court under subdivisions (a), (b), and (j) of section 300. The court ordered family reunification services for both parents and granted monitored visitation for father. The court ordered father, among other things, to participate in a domestic violence program, individual counseling, and drug testing, and to obey protective orders. Sons were removed from father's custody and care and placed with mother under Department supervision.

In early August 2021, seven months after the petition had been filed, the Department reported it had been unable to locate father. Father had not participated in any court-ordered services and had no monitored visits with sons. At the same time, the Department reported mother had completed her court-ordered programs. The Department recommended terminating

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

4

jurisdiction and granting mother sole physical and legal custody of sons.

However, soon after, in mid-August 2021, the Department filed a supplemental petition alleging mother had violated the active criminal protective order as well as juvenile court orders (supplemental petition). Specifically, the supplemental petition alleged mother had been in contact with father and had allowed him unlimited and unmonitored contact with sons. The Department reported mother had not been honest about her contact with father or knowledge of his whereabouts. In addition, mother was pregnant with father's twins. Mother and father had violated court orders and the criminal protective order. Sons were removed from mother and placed in foster care and then with maternal aunt.

Also in mid-August, father finally met with Department social workers. He apologized that he " 'went MIA' " and indicated he wanted " 'to get back on track.' " He admitted he violated the criminal protective order. Father had enrolled in and completed several domestic violence group workshops. Father began drug testing and enrolled in a parenting program. Father also began monitored visits with the children, which went well. Paternal grandfather monitored the visits. By October 2021, father had signed up for individual counseling.

In mid-October 2021, the juvenile court sustained the supplemental petition and ordered family reunification services for mother and father, including monitored visitation. The children remained placed with maternal aunt.

### 3. Reunification Period

#### a. Mother and Twins

In December 2021, the twins were born and declared dependents of the court. In January 2022, they were placed with maternal aunt, who at the time continued to care for sons as well as her own two young children.

In February 2022, the Department allowed mother to have unmonitored visits with all four of her children. The next month during one of her unmonitored visits, mother allowed father to visit with the children. In August 2022, mother had a violent outburst at father's home, which resulted in mother's arrest. Mother's visits returned to monitored.

#### b. Sons

In early April 2022, the Department reported sons were bonded with maternal aunt and were doing well in her care, although they displayed some aggressive behaviors. Later that same month, however, two maternal uncles attacked father, paternal grandfather, and a paternal uncle as they were returning all four children to maternal aunt's home after a visit. As a result, father and the paternal uncle were hospitalized. Maternal aunt requested sons and twins be placed in a different home.

In late September 2022, after moving through a few different placements, sons were placed with non-relative caregivers Ms. K and Mr. M (caregivers). Sons remained with caregivers for the remainder of the proceedings. Sons bonded with the caregivers and became affectionate and comfortable with them. Under caregivers' care, the children made great strides in their emotional and social development. The caregivers provided professional care for older son's diagnosed PTSD and younger

son's speech delay.  Caregivers are the children's prospective adoptive parents.  Father and mother both indicated they wanted to reunify with the children, but also liked the caregivers and were open to them adopting sons.

### c.     Father

Despite his progress in many areas and willingness to learn, father continued to struggle.  In late March 2022, father tested positive for cocaine.  Soon after, father enrolled in a substance abuse program, but five months later he was terminated by the program.  By July 2022, father also was in danger of being terminated from his domestic violence program because he missed many sessions.  The facilitator of that program noted father had become less engaged, which was unusual for him.  Father admitted (although later recanted) he visited his children while they were with mother, which violated court orders, and sometimes was with mother instead of visiting the children as scheduled.  In September 2022, mother and father had another physical altercation, during which mother sustained a cut to her lip.  By October 2022, father had moved out of paternal grandparents' home because he "was 'causing too much problems to family.' "  Father stated he was unemployed and " 'surf couching.' "  By February 2023, however, father was employed full-time.

### d.     Visits

In early 2022, when sons still were placed with maternal aunt, the Department reported father had been visiting sons consistently and had completed or almost completed his court-ordered services.  A Department social worker noted father and sons had "a strong attachment" and father "demonstrates having a positive emotional bond to his children."

In March 2022, however, maternal aunt reported father no longer was consistent with his visits and was not communicating with her as well as he previously had. In October 2022, the Department similarly reported father's visits were inconsistent.

In early 2023, caregivers reported father's visits with the children went well. After visits with mother and father, however, the children regressed to problematic behaviors such as hitting and screaming.

4.    **Termination of Parental Rights**

By February 2023, the Department recommended terminating reunification services. Although the Department believed father "loves his children" and "has good intentions of reunifying with his children and providing for them," the Department also noted father "has continued to only have monitored visits [throughout] the life of this case with very slow progress due to past substance use, going to classes and not completing them, and continued violent engagement with the mother." According to the Department, father had gained "minimal insight" into "his current situation."

In April 2023, the juvenile court terminated reunification services for mother and father and set the matter for a permanency planning hearing. In June 2023, the juvenile court granted caregivers' request for de facto parent status.

Prior to the permanency planning hearing, the Department reported sons continued to do well and progress socially, emotionally, and intellectually with caregivers' support and attention. The Department stated sons had "a strong emotional attachment to [caregivers] in that they seek them for comfort and affection, and are easily soothed by them."

During the months leading up to the permanency planning hearing, father visited sons consistently, missed "a handful of times," and often arrived late. Paternal grandfather continued to monitor father's visits. Paternal grandfather reported father was appropriate and attentive with sons, fed them, played with them, and changed the younger son's diaper. Paternal grandfather said sons listened to father, behaved well during visits, and "love to spend time with their father." According to the Department, father engaged sons, spoke appropriately with them, and sons enjoyed their visits with father. The Department described "a positive emotional bond" between father and sons, noting sons "seek" father, "smile when they see him and respond with excitement when they expect to visit him."

Nonetheless, it was apparent sons regressed after visits. Caregivers and sons' teachers reported sons were agitated and angry after visits with father. Sons' therapist also noticed a change in their behavior after visits with father. The Department noted, after visits with father, the older son's "hitting behavior toward his brother increases," he "has difficulty readjusting to the routine of the [caregivers'] home," and "he has a lower frustration tolerance at school after the visits." Caregivers also reported visits "destabilize[d] [older son's] mood" and caused "reduction in age-appropriate behavior" for younger son, all of which had been witnessed by teachers, social workers, and others. Caregivers described an instance when the day after a visit with father, younger son had an hours-long "meltdown" over juice. Caregivers did not know why sons regressed after visits, saying father "talks to [the] children appropriately and appears engaging."

It was also reported father was not particularly concerned with sons' medical or developmental needs or appointments. For example, after younger son injured himself, requiring an emergency room visit, father did not inquire how younger son was doing. And when older son required dental treatment under sedation, father failed to attend the appointment as agreed to provide consent. After the procedure, father did not inquire as to older son's well-being. Caregivers also expressed concern that, despite being advised against giving sons junk food, father continued to provide sons with "juice, soda, and junk food during their monitored visits with him." Notably, father had received six letters from different pediatricians advising that the older son was not to have sugar. Similarly, although father had been asked not to bring balloons during visits because they were "a trigger" for the older son, father brought balloons for the younger son's birthday. Caregivers noted father (and paternal grandfather) would laugh when sons fought instead of intervening. Caregivers believed sons saw father "more as a friend, than a father figure" and had a "brother type relationship" with father.

The Department recommended adoption as sons' permanent plan. Caregivers wanted to adopt sons and provide them with a "loving, nurturing and stable home environment." After almost one year with caregivers, sons looked to caregivers "for comfort in the form of hugs and reassurance they are okay" and were "comfortable in their presence." The Department concluded father did "not have a bond with the children . . . that would be a barrier to . . . adoption."

The permanency planning hearing was held on August 15, 2023. Counsel for father urged application of the beneficial

parental relationship exception to adoption. Counsel argued sons "would be affected negatively by losing [their] parental relationship [with father]," which counsel described as a "significant, positive emotional attachment." Counsel believed "it would create a hole in [sons'] lives to not have the father be a part of their lives." On the other hand, counsel for the Department argued the court should terminate parental rights. The Department's counsel stated, "Father does not function in a parental role. At best, he's like an extended family member, maybe an uncle or a cousin who is around on occasion." Similarly, counsel for caregivers urged the court to terminate parental rights, arguing, "Father has not acted as a parental figure in the children's life."

After hearing argument, the juvenile court found sons were adoptable and no exception to adoption applied. The court determined sons' lives "would look no different" if the parental relationship were terminated. The court stated, "[A]s much as [father] believes he's doing something that's parental, he's . . . like a good uncle or adult cousin or extended family member maybe." The court noted caregivers had been granted de facto parent status, had been parenting sons on a daily basis, and had been "the parents that these two children need." Accordingly, the juvenile court terminated mother's and father's parental rights to sons.

5.    **Facts Relevant to ICWA**

In connection with filing the petition, a Department social worker reported mother gave the social worker "no reason to believe" sons were Indian children. In its detention report for the court, the Department stated, "[M]other denied having Indian

11

Ancestry." Mother also filed a form ICWA-020, indicating sons were not Indian children for purposes of ICWA.

At the detention hearing, the juvenile court found it had no reason to know sons were Indian Children for purposes of ICWA. Nonetheless, the court ordered parents to keep the attorneys and the court apprised of any new ICWA-related information.

In August 2021, father filed an ICWA-020 form, indicating sons were not Indian children for purposes of ICWA. That same month, the juvenile court stated, "ICWA does not apply to this case," and, "This is not an ICWA case."

In October 2021, both mother and father stated they were born in Los Angeles and denied having Indian ancestry.

In April 2023, father told a Department social worker he did not have Indian ancestry. At the April 2023 hearing during which the juvenile court terminated the parents' reunification services, the court asked mother and father if they had American Indian heritage and if they knew of relatives who might know of such heritage. Mother and father replied no to both questions. At that hearing, the court held the case was not an ICWA case.

In July 2023, paternal grandparents denied Indian ancestry and father again denied Indian ancestry.

The Department did not ask any maternal relatives whether sons might be Indian children for purposes of ICWA.

6.     **Appeal**

Father appealed the juvenile court's August 15, 2023, orders.

## DISCUSSION

### 1. Termination of Parental Rights

#### a. Applicable Law

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies. (§ 366.26, subds. (b) & (c)(1).) Here, it is undisputed sons were likely to be adopted. Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.

The exception father raises is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides: "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

To establish this exception, the parent must prove the following three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best

13

interests." (*Id.* at p. 632.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

### b.    Standard of Review

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review.  On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception].  The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion.  As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

14

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### c. No Error

Father argues the juvenile court erred when it failed to apply the beneficial parental relationship exception to adoption. Father claims the court should have ordered a legal guardianship instead so that sons could continue their relationship with him. Father asserts he satisfied all three elements of the beneficial parental relationship exception. We assume father satisfied the

first element (regular visitation and contact with sons) and the second element (a relationship with sons, the continuation of which would benefit them). We conclude, however, the juvenile court did not abuse its discretion in determining father failed to establish the third element.

As noted above, the third element requires the juvenile court to "decide whether it would be harmful to the child to sever the [parental] relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Although the loss of a parental relationship, including the one in this case, may certainly cause detriment to a child, the question for the juvenile court is whether the countervailing positives the child gains in a permanent, stable home outweigh any such detriment. (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

Here, it was not an abuse of discretion to determine adoption by caregivers outweighed any detriment sons might experience by losing their relationship with father. Although it is clear sons enjoyed their time with father and the Department described a "strong attachment" and a "positive emotional bond" between father and sons, it was reasonable to conclude maintaining this relationship did not outweigh the " 'the security and the sense of belonging a new family would confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Father has not occupied a

16

parental role in sons' lives for years. For most of their young lives, sons have not lived with father and their visits with him all have been monitored.[3] Moreover, father did not attend or ask about many of sons' medical appointments and procedures, or educational meetings and developments. On the other hand, for one of the first times in sons' very short lives, caregivers created a stable and secure home for them. It is undisputed sons were happy, comfortable, and thriving with caregivers. Sons were making strides in all aspects of their lives.

Contrary to father's suggestion, the decision to terminate parental rights (and not apply the beneficial parental exception) was not based on an improper comparison of parenting styles. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Rather, it was based both on the factual record, which reveals concrete benefits sons realized through a stable home environment, as well as the legal requirement that, at this stage of dependency proceedings, the paramount concern is the child's best interests. (*Id.* at p. 633; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [noting, after reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability' "].) The juvenile court did not abuse its discretion when it refused to apply the beneficial parental relationship exception here.

## 2. ICWA

### a. Applicable Law

ICWA establishes minimum standards courts must follow before removing an Indian child from his or her family. Under California law implementing ICWA, the juvenile court and the

---

[3] This does not include the unauthorized visits mother allowed father to have with sons.

Department "have an affirmative and continuing duty to inquire whether" a dependent child "is or may be an Indian child." (§ 224.2, subd. (a); *In re Austin J.* (2020) 47 Cal.App.5th 870, 883, superseded by statute on other grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147.)  For these purposes, an "Indian child" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal law definition].)

Under ICWA as implemented in California, "the Department and juvenile court have 'three distinct duties.' [Citations.]  The first duty is the initial 'duty' of the Department and the juvenile court 'to inquire whether [a] child is an Indian child.'  (§ 224.2, subds. (a) & (b).)  The Department discharges this duty chiefly by 'asking' family members 'whether the child is, or may be, an Indian child.'  (*Id.*, subd. (b).)  This includes inquiring of not only the child's parents, but also others, including but not limited to, 'extended family members.'  (*Ibid.*)" (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578 (*Dezi C.*).)  "Extended family members" include the dependent child's adult "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c) [adopting federal law definition].)  "For its part, the juvenile court is required, '[a]t the first appearance' in a dependency case, to 'ask each participant' 'present' 'whether the participant knows or has reason to know that the child is an Indian child.'  ([§ 224.2], subd. (c).)"  (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 780, rev.gr.)

"The second duty is the duty of the Department or the juvenile court to 'make further inquiry regarding the possible Indian status of the child.' ([§ 224.2], subd. (e).) This duty of further inquiry is triggered if the Department or court 'has reason to believe that an Indian child is involved' because the record contains 'information . . . suggesting the child is Indian' (*ibid.*; [citations]), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact the relevant Indian tribe(s). (§ 224.2, subd. (e)(2).)" (*Dezi C.*, *supra*, 79 Cal.App.5th at pp. 780–781, rev.gr.) "Reason to believe" is defined as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

"The third duty is the duty to notify the relevant Indian tribe(s). (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).) This duty is triggered if the Department or the court 'knows or has reason to know . . . that an Indian child is involved.' (§ 224.3, subd. (a).)" (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 781, rev.gr.)

### b.    Standard of Review

" '[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.) Even if substantial evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.)

California appellate courts have taken varying positions on the rules for assessing whether a defective initial inquiry is harmless.  The varying approaches have led to "a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA." (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011; see *Dezi C.*, *supra*, 79 Cal.App.5th at pp. 777–778, rev.gr.)  Our division has adopted the following rule:  "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Dezi C.*, at p. 779, rev.gr.)

### c. No Reversible Error

In this appeal, we are concerned with the initial duty of inquiry.  Specifically, father argues the juvenile court and the Department failed to fulfill their duties under ICWA because the Department did not ask, and the court did not ensure that the Department ask, maternal relatives or paternal relatives (other than paternal grandparents) whether the children had Indian ancestry.  As a result, father argues we must reverse the order terminating parental rights and remand for further proceedings in compliance with ICWA.  The Department concedes error with respect to mother's side of the family, but asserts any error was harmless.

As an initial matter, we agree with father that the Department erred in not asking the many reasonably available

extended family members—both maternal and paternal—whether sons might be Indian children for purposes of ICWA. Given this error, we must consider whether it requires remand. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.)

As noted above, we consider the Department's failure to conduct a proper initial inquiry harmless unless the record contains a reason to believe the children are Indian children within the meaning of ICWA. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779, rev.gr.) The record here contains no such evidence. Mother and father consistently stated they had no Indian ancestry. The paternal grandparents reported the same. Nothing in the record below suggests mother, father, or either of the sons "is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) No proffer to that effect has been made on appeal. Although on appeal father relies on cases from different appellate districts as well as different divisions within this district, our division follows *Dezi C.*, *supra*, 79 Cal.App.5th 769, review granted. We respectfully decline to follow the other cases cited. Thus, although the Department clearly erred by not inquiring of many reasonably available extended family members, we conclude this error was not prejudicial and is not grounds for reversal.

## DISPOSITION

The juvenile court's August 15, 2023 orders are affirmed.

NOT TO BE PUBLISHED.


                                        LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.